IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 04-cv-01969-WDM-MJW

FRONTRANGE SOLUTIONS USA, INC.,

      Plaintiff,

v.

NEWROAD SOFTWARE, INC., et al.,

      Defendants.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

Miller, J.

      This case is before me on the motion for summary judgment (doc no 99) filed by

Defendants NewRoad Software, Inc. ("NewRoad")[1], Nathan George ("George"), Marty

Kurzinski ("Kurzinsky"), and David Phelps ("Phelps").  Plaintiff FrontRange Solutions USA,

Inc. ("FrontRange") opposes the motion.  I have reviewed the parties' written arguments

and the evidence submitted with the briefs and conclude that oral argument is not required.

For the reasons that follow, I will grant the motion in part.

### Background[2]

      This is a contract and trade secret dispute between two software development

companies.  FrontRange is a developer and marketer of software products.  One of its

---

[1]     NewRoad was acquired by LANDesk, Inc., in January 2006.

[2]     The facts presented here are drawn from the parties' summary judgment briefs and attached evidence; as discussed below, unsupported conclusory assertions are not sufficient to demonstrate factual disputes.

main product lines is a type of customer support software called HEAT.  FrontRange

distributes its products in a number of ways, including through value added resellers, who

might sell HEAT, add-on products, and provide customer support.  One of FrontRange's

top resellers before 2004 was Enterprise Computer Solutions, Inc. ("ECS")[3] a company

owned in part by Defendants Kurzinsky and George.  The relationship between ECS and

FrontRange was governed by several agreements, many of which contained confidentiality

and non-disclosure provisions.  The primary agreement is the "Goldmine [now FrontRange]

Solutions Partner Agreement" which defines confidential information as including "the

identities of and [FrontRange's] relationship with End-Users and prospective End-Users"

but expressly excludes the reseller's own customers and prospects.

Kurzinsky and George thereafter established NewRoad to develop other software

products that were also sold through ECS.  One product was called WebCenter, which

permitted web-based access to HEAT.  WebCenter was developed using the then-existing

version of HEAT, referred to as HEAT 7.0.  NewRoad also developed and marketed two

related products called CustomerView and PortalView.  At the time, HEAT would operate

only on a customer's dedicated network and FrontRange perceived a need to offer a

version that clients could access from the Internet.  In early 2003, George informed

FrontRange of the WebCenter product and stated that he had installed it for several

customers who were happy with its performance.  FrontRange had recently reorganized,

changed its top management, and let go or transferred many of its engineers.  Its top

managers were unsure of whether FrontRange had the resources to build its own web

---

[3]       ECS was acquired by a third party in May 2004.

product.  Accordingly, FrontRange expressed interest in acquiring NewRoad's software and began to review it.

Around April 2003, Kelvin Yund, an engineer from FrontRange, examined the source code for the then-existing version of WebCenter.  He identified numerous issues relating to the basic architecture of WebCenter which could cause problems if any modifications were made to HEAT.  FrontRange's upper management denies receiving this information from Mr. Yund or from his supervisor, for whom Mr. Yund prepared a report. Mr. Yund and others believed that FrontRange could build a superior product on its own rather than purchase WebCenter.

FrontRange came up with a list of requirements that it wanted for a web-based product.  George informed FrontRange before any agreement was signed that NewRoad could not meet all these requirements before the sale but that they could be addressed in future versions.

The Software Purchase Agreement ("SPA") was executed on July 18, 2003 for the purchase of the then-existing version of WebCenter ("WC1").  Pursuant to the SPA, FrontRange would pay $400,000 for all rights and title to WebCenter, as well as royalties on sales of FrontRange products, and the option to purchase CustomerView and PortalView (the "Prototypes").  SPA, Sec. 2.01, 2.02.  A small initial payment would be made upon execution and the remaining balance would be paid "upon Acceptance," as defined.  SPA, Sec. 2.01(b).  The SPA included several provisions concerning evaluation and due diligence.  It recites that "FrontRange shall have ample opportunity . . . to conduct its own assessment of the Program and Prototypes and to satisfy itself concerning any and

3

all matters related or relating, directly or indirectly, to the Programs and Prototypes." SPA, Sec. 3.01. The performance requirements of the software were set forth in an attached exhibit. The agreement recognized that due diligence was already underway and further provided that after NewRoad delivered the Program, "FrontRange shall have 30 calendar days to inspect and determine in its sole discretion, whether the Program is in conformance with the Requirements." SPA, Sec. 4.01. The SPA provided that FrontRange would have access to the Program's source code during the evaluation period. SPA, Sec. 3.02. During the 30-day inspection period, NewRoad was obligated to correct any deficiencies of conformance with the requirements within five days. SPA, Sec. 4.01. Upon acceptance by FrontRange, NewRoad would convey all ownership and rights in the program. SPA, Sec. 7.01. The SPA limits indirect, incidental, consequential or special damages, and lost profits. SPA, Art. XII. Finally, the SPA expressly deals with errors identified during and after the 30-day inspection period. It sets forth that at the end of the inspection period, all required errors identified as of that time "shall be the definitive list of error fixes required." SPA, Exh. A, Sec. 2.04. Any new errors "that may be identified thereafter shall not be a Requirements compliance issue and that any further error fixes required thereafter shall be expressly limited to fixes of such previously identified errors." *Id*.

An internal email from a FrontRange project manager discussed the purchase of WebCenter on July 21, 2003. The email recited that, "It is the team's understanding that the final build [of WebCenter] can be rejected based on explicit or implicit requirements." The email also noted that changes in the next release of HEAT, HEAT 8.0, could affect

WebCenter and could require rewriting of the code.

Timothy Binkley-Jones, a FrontRange software engineer, conducted due diligence on WC1 during the inspection period.  In an email dated August 14, 2003, he informed FrontRange of certain problems with the code and architecture, including issues that could cause bottlenecks, different coding languages that could create difficulties in the future if an engineer did not know both languages, and basic design features in the way WC1 worked around and interacted with HEAT's autoprogramming interface ("API").  Mr. Binkley-Jones also expressed concerns in the email and thereafter that the product was not as good as one that was built from the ground up.

On August 23, 2003, an email from the product market manager at FrontRange stated "The Product Marketing and Management Teams have agreed today to formally accept the product" and requested a check for the full payment amount pursuant to the SPA.  It is undisputed that no customer information was conveyed to NewRoad in connection with the SPA.

Internal emails between FrontRange employees on August 27, 2003 made clear that the company knew that WC1 was certified only with HEAT 7.0 and that problems were being encountered with HEAT 8.0, which was expected to be released in a few months. In the same email string, FrontRange engineers identified the need for a patch or other modification to make WC1 work with HEAT 8.0.  There is deposition testimony from FrontRange personnel confirming that NewRoad was not required to make WC1 compatible with HEAT 8.0 as part of the SPA and FrontRange did not give NewRoad the HEAT 8.0 code.

5

FrontRange issued a check dated August 27, 2003 for WebCenter and NewRoad transferred to FrontRange the title and rights to the program, as well as existing customers already using the product.   FrontRange also exercised its option to purchase CustomerView and PortalView.   FrontRange announced on its website and in press releases around September 29, 2003 that WC1 had passed specified testing and was ready for sale.  FrontRange made royalty payments until around mid-2004.  Several senior representatives of FrontRange testified in their depositions that NewRoad had complied with its obligations under the SPA.

Thereafter, FrontRange developed a patch to enable customers to use WebCenter with HEAT 8.0.  This version of the program is referred to as WebCenter 1.1 ("WC1.1") and was released in early 2004.

After execution of the SPA, the parties began negotiations for further development of WebCenter.   NewRoad delivered a document entitled "Proposal for Phase II of WebCenter Development," dated August 11, 2003.  The proposal included re-engineering the HEAT API and described the amount of time it would take to complete certain features. FrontRange requested an estimate from its own engineers about the cost of doing the work in-house and decided that it would be more efficient to have NewRoad contract for it.  It is undisputed that FrontRange could have used any software engineering resources to further develop the product and was not required to use NewRoad.

An email dated September 29, 2003 from Jim Blayney at FrontRange to Nathan George entitled "WebCenter 2.0 Requirements" purports to include a spreadsheet containing WebCenter 1.0 and 2.0 requirements, including "Original WebCtr 1.0

6

requirements (validated)" and "New WebCtr 2.0 requirements (to include NRS exceptions and comments)" and "Documented BITS Issues from 1.0" (BITS was a reporting system for errors or requests for enhancements). This was apparently to be attached to a new consulting services agreement (the "CSA") as describing the scope of work to be performed by NewRoad. It was decided that the HEAT API would not be reengineered by NewRoad and the API code was not given to NewRoad.

The CSA was executed by FrontRange and NewRoad in October 2003. The services to be performed and product requirements were included in Exhibit A of the agreement. Exhibit A included several introductory statements. One concerned prioritization of requirements. Another recited that "Issues that arise from the V.1 release of WebCenter could supercede the version 2.0 requirements. Those requirements will be jointly agreed upon by both [FrontRange] and [NewRoad]." Exhibit A also states, "We need to account for the fact that we have not done considerable testing around WebCenter 1.0 and HEAT 8.0. Right now it is 'working' with HEAT 8.0 Beta code and have discovered [sic] some issues surrounding new features." Deposition testimony from Mr. Blayney indicates that requirements for WC2 (later referred to as WebCenter 8.0, correlating with the version 8.0 release of HEAT) were the subject of negotiation and changed by mutual agreement between the parties. The development of WC2 was a joint effort between FrontRange and NewRoad.

Work began on WC2 in late 2003 and early 2004. NewRoad would deliver draft versions of WC2 to FrontRange for testing. FrontRange would report back errors and defects for NewRoad to remedy, and then a revised version would be sent back. This

occurred several times throughout 2004, but employees on both sides became frustrated as the number of errors reported increased and NewRoad had difficulties working around the HEAT API, for which it had no source code.  NewRoad sent the last revised draft around May 26, 2004.  In June 2004, NewRoad's engineers told FrontRange that the next revision of WC2 would not be available until the end of July or August, which was significantly later than expected for the target release date.  FrontRange decided to have another company continue work on WC2 and stopped paying royalties pursuant to the SPA.  WC2 was never completed.[4]

Before the project was terminated, NewRoad installed early versions of WC2 with several customers for testing.  There is a factual dispute as to whether this was done with the knowledge and consent of FrontRange.  Several customers reported problems with WebCenter or CustomerView, or made requests for enhancements.

Defendant Phelps was laid off from FrontRange around July 2003, where he previously worked as a marketing director.  In that capacity, he worked with resellers such as ECS and had developed a relationship with Kurzinski and George.  After leaving FrontRange, Phelps contracted with NewRoad as a consultant to assist in marketing efforts.  FrontRange's witnesses in their depositions did not identify any evidence that Phelps had taken a customer list or database file from FrontRange upon his departure and all the Defendants deny that this occurred.  FrontRange publishes the names of many of its customers and customer testimonials on its website.

---

[4]FrontRange asserts that WebCenter was unfixable, but the only evidence it provides to support this are the hearsay statements attributed to its subsequent development company, which are inadmissible.

In 2003 and 2004, NewRoad developed a new program called Autobahn, which enhances the functionality of HEAT.  It is an add-on product and there is no evidence that a customer would purchase Autobahn instead of HEAT; rather, an existing user of HEAT might purchase Autobahn to get certain features that HEAT does not have.

In August 2004, NewRoad sent an email "blast" (a single unsolicited email sent to numerous recipients) to approximately 2700 email recipients.  The email had NewRoad's logo at the top of the page and contained the following text:

> Special Offer for HEAT® Customers
>
> Change Management for HEAT®!
>
> Are you looking for a software package that is easier to develop automated processes in than HEAT®?  Have you run into Change Management nightmares because of BPAM issues?  Are you unable to troubleshoot, maintain, and support the automated processes you've developed in HEAT®?

The email text then goes on to state that these issues would be resolved with NewRoad Software Autobahn and describes the features of Autobahn.  Defendants have presented uncontested evidence that no sales occurred as a result of the email blast.  Phelps designed the email based on his knowledge of FrontRange's guidelines for use of the trademark by third parties.  He also designed the email so that it would not incorporate any of FrontRange's distinctive trade dress.

Defendants' evidence shows that the list of email addresses for the email blast was from a larger customer list compiled by ECS and transferred to NewRoad.  The list may have included names that were obtained by ECS from leads provided by FrontRange, from information collected by ECS at user group meetings sponsored by ECS or FrontRange,

9

information collected at trade shows, or from lists purchased and then researched by ECS. Deposition testimony from Kevin Smith, FrontRange's vice president of products, indicates that FrontRange knew that its resellers obtained customer information at user group meetings and that sometimes that information was used for purposes of marketing non-FrontRange products but that FrontRange did not take a consistent approach in dealing with this. FrontRange's counsel sent a letter dated August 24, 2004 directing NewRoad to cease and desist using the HEAT trademark. There is no evidence that NewRoad used the mark or used the ECS customer list for marketing purposes thereafter.

FrontRange brings twelve claims for relief: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (2) false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a); trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (4) common law trademark infringement; (5) breach of the SPA; (6) breach of the SPA's implied covenant of good faith and fair dealing; (7) misappropriation of trade secrets obtained pursuant to the SPA; (8) misappropriation of trade secrets obtained during his employment against Phelps; (9) breach of the CSA; (10) breach of the CSA's implied covenant of good faith and fair dealing; (11) unfair misappropriation; (12) intentional interference with contractual relations. NewRoad filed a counterclaim for breach of the SPA based on FrontRange's failure to pay royalties.

Defendants move for summary judgment on all claims.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

10

A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id*.

Discussion

Defendants' motion is well-supported with affidavits and deposition excerpts, as well as with documents verified by affidavit. I find the motion meets the criteria of Rule 56(e), so that the burden shifted to Plaintiff to present proper summary judgment evidence to preclude entry of judgment against it. Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party").

Rule 56(e) requires that "[s]upporting and opposing affidavits shall be made on personal knowledge" and that the facts set forth be admissible in evidence. FrontRange is not entitled to rely on the protection of the rule that "[m]aterial factual disputes cannot

be resolved at summary judgment based on conflicting affidavits" unless its affidavit meets these requirements. "[C]onclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). FrontRange has submitted numerous affidavits from its current and former employees all purporting to be made on "personal knowledge." However, these affidavits are replete with factually unsupported conclusions, hearsay, statements indicating no personal knowledge at all, and self-serving assertions not corroborated by reference to any record evidence or contradicted by the evidence or the affiant's previous deposition testimony.[5] To the extent these affidavits contain statements that are inadmissible, I will not consider them for the purposes of determining genuine questions of material fact precluding summary judgment.[6] *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n. 4 (10th Cir. 2004) (assertions in affidavit that were not supported in the record by corroborating evidence are insufficient to create a genuine question of material fact precluding summary judgment). FrontRange attempts to raise

---

[5]     Many of these affidavits contain the same conclusory paragraphs with no identification of actual underlying facts or knowledge of such facts. For example, many of the affidavits contain statements such as "NewRoad promised . . ." or "NewRoad knew . . ." without identifying any person, statement, circumstance, or date of conversation or written representation showing a promise or knowledge. Other alleged "facts" in the affidavits are legal conclusions requiring inference upon inference from the meager factual information offered. For example, in the Affidavit of Keith Barr, the affiant testifies that Defendant George in a certain email "confirmed NewRoad's commitment to FrontRange and his continuing effort to making WebCenter a fully functioning piece of web-based enterprise software for FrontRange," when the email itself states only that George is looking forward to working with FrontRange's new management and "I am enclosing the proposal for the next phase of WebCenter for you to assimilate." These affidavits disserve the credibility of FrontRange and its counsel.

[6]     These issues are also addressed in my order on Defendants' Motion to Strike Sham Affidavits (doc no 151).

issues of fact by deluging the court with hundreds, if not thousands, of pages of exhibits, many of which have no probative value and/or the significance of which are not demonstrated in FrontRange's briefs.  FrontRange is reminded that only <u>genuine</u> issues of material fact will preclude entry of summary judgment and that this is determined by the quality, not the quantity, of the evidence.  Although numerous citations are provided, many of them refer to large quantities of documents, such as the two volumes of error reports provided in one exhibit.  "Judges are not like prospectors, searching tirelessly for a glitter of relevant evidence in the towering mountain of documents that might have some relevance to the case." *Adams v. Dyer*, 223 Fed. Appx. 757, 762 n. 4 (10th Cir. 2007).

1.     <u>Breach of the SPA</u>

Defendants move for summary judgment on FrontRange's claims that Defendants breached the SPA by failing to provide a working product and by violating confidentiality provisions.  I agree with Defendants that summary judgment should enter on these claims.

Defendants have demonstrated by competent and admissible evidence that the SPA set forth the requirements that the software had to meet, that FrontRange examined and tested the software and determined that it was satisfactory, that FrontRange accepted the product pursuant to the SPA, that FrontRange made payment and commenced royalty payments, that FrontRange commenced sale of the product, and that numerous FrontRange managers admitted in their deposition testimony that NewRoad had complied with its obligations under the SPA and that FrontRange had accepted the software. Moreover, there is no evidence that any confidential customer information was disclosed to NewRoad pursuant to the SPA or that NewRoad improperly used any information

obtained pursuant to the SPA.  Finally, Defendants argue that the implied duty of good faith and fair dealing cannot be used to contradict express contract terms for which the parties have bargained.

In response, FrontRange argues that the contract is ambiguous and that parole evidence should be permitted to illuminate ambiguous terms.  Using this as a starting point, FrontRange argues that NewRoad undertook to provide, pursuant to the SPA, "enterprise" and "turnkey" software, as FrontRange has defined it, that would support a certain number of users, have certain characteristics in terms of stability and upgrades, and be ready to be installed without effort or work by FrontRange.  FrontRange further argues that it did not waive defects or problems that surfaced later, that it never "accepted" the software or that it revoked acceptance, and that NewRoad breached implied warranties of merchantability and fitness for a particular purpose.  I will address each of these issues in turn.

The parties do not dispute that Colorado contract law applies.  The interpretation of a contract is a question of law.  *Ad Two, Inc. v. City and County of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000).  "It is a court's duty to interpret a contract in a manner that effectuates the manifest intention of the parties at the time the contract was signed. A touchstone in determining the intention of the parties to a contract is the language of the written agreement. If the language is plain, clear and unambiguous, a contract must be enforced as written." *Randall & Blake, Inc. v. Metro Wastewater Reclamation District*, 77 P.3d 804, 806 (Colo. App.2003).  Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract.  *Ad*

14

*Two*, 9 P.3d at 376.

The contract language here is unambiguous.  It sets forth the requirements of the software, gives FrontRange 30 days to identify problems and to either continue with the contract on the condition the issues identified in that 30 days be remedied within five days or to reject the product, and made FrontRange responsible for anything arising thereafter. FrontRange has not shown that any issues identified to NewRoad in the 30 day period were not remedied to its satisfaction.  Rather, FrontRange's complaints go to the basic architecture/design of the program, which the evidence shows FrontRange had notice of or the opportunity to discover, or problems arising with the efforts to develop a second, enhanced version of WebCenter that would work better with HEAT 8.0.  The SPA clearly puts the risk and burden on FrontRange to determine for itself whether the software was what it wanted, but also permitted it to reject the product without penalty if it determined that the software was unsuitable.  Because the contract is unambiguous, any claims based on the failure to provide a product with the broad characteristics FrontRange now demands must be the responsibility of FrontRange.

FrontRange argues that it did not waive defects arising after the inspection period because of the existence of a general non-waiver provision in the SPA.  This term provides, "The failure of either Party to exercise any of its rights under this Agreement for a breach thereof will not be deemed to be a waiver of such rights nor will the same be deemed to be a waiver of any subsequent breach."  SPA, Sec. 13.08.  FrontRange thus requests that I construe the agreement to permit this boilerplate, generic provision to eviscerate the specific, bargained-for terms allocating risks and burdens, which is contrary

to fundamental rules of contract interpretation.  *Holland v. Board of County Comm'rs of County of Douglas,* 883 P.2d 500, 505 (Colo. App. 1994) ("[I]t is a basic principle of contract law that specific clauses of a contract control the effect of general clauses.").  I must construe the words and phrases in the contract by examination of the contract as a whole, giving effect to all terms.  *Randall & Blake, Inc.,* 77 P.3d at 806.  I decline to adopt FrontRange's interpretation, which would negate specific key terms of the agreement. Moreover, reading the contract as a whole, this provision would not apply.  Section 2.04 of Exhibit A provides that "new errors that may be identified thereafter shall not be a Requirements compliance issue."  In other words, errors arising after the inspection period are not a breach of the agreement and, therefore, the non-waiver provision is inapplicable.

FrontRange also appears to argue that the express contract terms should be modified because it claims that it only made payment in reliance on promises by NewRoad about future performance or that somehow the CSA, whereby NewRoad undertook to develop the next version of WebCenter, was incorporated in the SPA.  FrontRange does not offer admissible evidence to support its contention that its payment was conditional. Rather, the only evidence in this regard are the self-serving affidavits of its employees, which recite the conclusory assertion that NewRoad's proposal to further develop WebCenter constituted a promise to fix all errors as they arose, notwithstanding the express limits contained in the SPA.  This is unsupported by the record evidence from the relevant time period and by the deposition testimony of many of these same employees. Moreover, like the SPA, the CSA contained a bargained-for, limited list of requirements,

16

which might include some issues from version 1 of the software but only as "jointly agreed upon" by both parties, not an unending promise to fix any errors arising thereafter. The CSA was a separate agreement, finalized and determined several months after acceptance of WC1 under the purchase agreement, containing discrete, segregable commitments. Both agreements are unambiguous and contain integration clauses. Extrinsic evidence is not permissible, therefore, to modify their terms. These are separate contracts and they do not, together or separately, contain promises to fix any and all errors as they arise or to otherwise modify the limitation on error fixes contained in the SPA.

FrontRange's argument that it never accepted WebCenter under the SPA, or that it is entitled to revoke acceptance, is also inconsistent with the record. The evidence demonstrating that FrontRange accepted the product is overwhelming, and includes internal communications affirming acceptance, payment, transfer of title/interest and customers from NewRoad to FrontRange, release of the product by FrontRange after certifying it, and deposition testimony by several managers and executives confirming that FrontRange accepted WebCenter. FrontRange attempts to create issues of fact by offering affidavits by several of these same employees which assert that FrontRange never accepted WebCenter in writing. The SPA does not require acceptance in writing and the conclusory affidavits are insufficient to create a genuine issue of fact in this regard. Moreover, FrontRange's argument that it is entitled to revoke its acceptance because of alleged oral promises to repair defects is unavailing for the reasons discussed above.

FrontRange also cannot prevail on its claim of breach based on implied warranties. In addition to the express contract terms, which are inconsistent with the claimed implied

warranties, FrontRange had the opportunity to inspect the software to determine its suitability. Under Colorado's Uniform Commercial Code, when a buyer before entering into the contract "has examined the goods or the sample or model as fully as he desired or has refused to examine the goods, there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." C.R.S. § 4-2-316(3)(b). FrontRange cannot rely on implied warranties under these circumstances.

FrontRange's other claim for breach relies on the implied duty of good faith and fair dealing. As noted by Defendants, this implied term cannot be used to contradict express terms for which a party has bargained. *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1996). FrontRange does not appear to dispute this. In addition, FrontRange concedes that no confidential customer information was transmitted to NewRoad pursuant to the SPA and there is no basis for finding that NewRoad breached this term. Finally, FrontRange argues that NewRoad's installation of draft versions of WC2 violated the SPA, but does not explain which term was violated by this conduct and I cannot discern any basis to conclude that this was a breach.[7]

Because there are no genuine issues of material fact as to NewRoad's performance under the SPA and it is undisputed that FrontRange ceased paying royalties, I conclude summary judgment should enter in favor of NewRoad and against FrontRange.

2.   <u>Breach of the CSA</u>

FrontRange claims that NewRoad breached the CSA by failing to provide working

---

[7]Moreover, this is apparently the first time FrontRange has alleged this theory of liability.

18

WC2 software, failing to provide the latest source code for WC2, using confidential customer information to market Autobahn, and breaching the implied covenant of good faith and fair dealing.  In its response to the motion for summary judgment, FrontRange also contends that NewRoad violated the CSA by installing early versions of WC2 for several customers.  NewRoad argues that FrontRange cannot show that NewRoad used any information obtained pursuant to the CSA to market Autobahn and that FrontRange cannot prove damages resulting from any other alleged breach.  I agree that NewRoad has shown, and FrontRange has not disputed, that NewRoad did not use any information obtained pursuant to the CSA to market Autobahn and no claim can survive on this basis. I also agree that FrontRange's claim for breach of duty of good faith and fair dealing fails as a matter of law for the reasons discussed above.  However, there appear to be genuine issues of fact with respect to damages under the CSA, in the event that FrontRange proves a breach at trial.

FrontRange claims a variety of categories of damages, including a refund of all amounts paid pursuant to the SPA (75% of the total contract), discounted software and maintenance allegedly provided as a result of the problems associated with WebCenter, time spent on bug fixes, amounts paid to third parties to repair the software, unplanned changes to other software, revenue losses for HEAT and other products, and reputational damages.  Defendants contend that these damages are legally and factually deficient.

The SPA provides that payment under the contract will be made in four equal installments corresponding to the achievement of various milestones, specifically: (1) signing of the contract; (2) Phase 1 Feature Drop (65% code complete); (3) Feature

Freeze (i.e., final requirements list); and (4) Final Acceptance.  The contract further provided that "FrontRange Solutions shall, in its sole discretion, determine if and when the Services have reached the delivery milestones and payment is due."  CSA, Exh. A. FrontRange made the first three payments when each milestone was achieved but refused to pay the final installment.  NewRoad argues that FrontRange is not entitled to a refund of these amounts because it is undisputed that NewRoad achieved each milestone for which the payment was made.  I agree and FrontRange offers no persuasive argument to the contrary.

In addition, I agree with Defendants that the vast majority of FrontRange's calculated damages allegedly resulting from the failure of the "WebCenter project" include unallocated consequential damages resulting from WC1 (which are not recoverable because there was no breach and the SPA precludes consequential damages), WC 1.1 (which was developed by FrontRange), and WC2, as well as numerous damages claims that are unsupported and/or completely speculative.  Much of this evidence will be inadmissible at trial.  However, it appears that there are at least some amounts that could legitimately be attributed to a breach of the CSA by NewRoad, in the event one is proven. For example, amounts paid to third parties to finish or repair WC2 appear to be causally related to the alleged breach of the CSA and are not speculative.  Because there is a genuine issue of material fact concerning the existence of damages resulting from the alleged failure to complete the CSA, summary judgment is not appropriate on this claim.

3.    <u>Trademark Claims</u>

Defendants seek summary judgment on all of FrontRange's trademark claims

because Defendants' use of the mark was a nominative fair use and not likely to cause customer confusion and because FrontRange cannot demonstrate any damages resulting from the email blast.

The gravamen of any trademark infringement claim is customer confusion. "The unauthorized use of 'any reproduction, counterfeit, copy, or colorable imitation' of a registered trademark in a way that 'is likely to cause confusion' in the marketplace concerning the source of the different products constitutes trademark infringement under the Lanham Act." *Universal Money Ctrs., Inc. v. AT & T Co.*, 22 F.3d 1527, 1529 (10th Cir.1994); 15 U.S.C. § 1114(1)(a)-(b). The party alleging infringement has the burden of proving likelihood of confusion. *Universal Money Ctrs.*, 22 F.3d at 1530. Customer confusion may be the result of a defendant's use of the trademark which is likely to cause consumers to believe either that the plaintiff is the source of the defendant's products or services (direct confusion), or alternatively, that the defendant is the source of the plaintiff's products or services (reverse confusion). *Id.*

The nominative fair use doctrine permits the use of trademark for purposes of comparison, criticism, or point of reference where it would be impossible to do so without using the mark. *New Kids on the Block v. News America Publ'g, Inc.,* 971 F.2d 302, 306 (9th Cir. 1992). Provided that "the unauthorized use does not falsely imply sponsorship or endorsement, the trademark owner cannot prevent the use." 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:11 (4th ed. 2007). Although the nominative fair use doctrine has not been recognized by the Tenth Circuit, the test applied in other circuits requires that three elements be met: (1) the product in question must be

21

one not readily identifiable without the use of its trademark; (2) only so much of the trademark must be used as is reasonably necessary to identify the product; and (3) the user must do nothing that suggests sponsorship or endorsement by the trademark holder. *New Kids on the Block,* 971 F.2d at 308; *see also Century 21 Real Estate Corp. v. Lendingtree, Inc.,* 425 F.3d 211, 222 (3d Cir. 2005) (establishing two part test: plaintiff must first demonstrate a likelihood of confusion, defendant then must show nominative fair use applying factors similar to those adopted in the Ninth Circuit). The fair use analysis is essentially an argument that there will be no infringement because there will be no likelihood of confusion. McCARTHY at § 23:11. Nominative fair use for the purposes of comparing or criticizing the product is a statutory exclusion to a trademark dilution claim under the Lanham Act. 15 U.S.C. § 1125(c)(3).

I agree that FrontRange cannot demonstrate a likelihood of confusion and that Defendants' use of the mark was fair. Although the nominative fair use analysis has not been adopted in this circuit, it is relevant to assist in determining the likelihood of confusion, which is a matter amenable to summary judgment. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999). As to the first element, it appears that HEAT is not easily described without the use of its mark, and it may be almost impossible for NewRoad to communicate Autobahn's compatibility with HEAT without using the mark. In addition, although the email refers to HEAT several times, it does not appear to be more than necessary for describing the limitations of HEAT and the beneficial advantages of Autobahn. Finally, overall, the email does not falsely imply endorsement of the product by FrontRange. The email uses generic type, prominently

22

displays NewRoad as the maker of Autobahn and the issuer of the email, and describes the limitations of HEAT.  Moreover, FrontRange offers little evidence of actual customer confusion.  It offers approximately four emails and communications from customers and resellers, most of which reflect concern about how NewRoad obtained the recipient's contact information.  These communications are insufficient as a matter of law to demonstrate a likelihood of customer confusion as a result of the email blast.  *Universal Money Ctrs.*, 22 F.3d at 1535 ("*De minimis* evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding the likelihood of confusion."); *King of the Mountain Sports,* 185 F.3d at 1092-93 (seven instances of confusion insufficient as a matter of law to demonstrate likelihood of confusion).

In addition, I agree with Defendants that FrontRange's alleged damages arising from the email blast are speculative and unfounded.  FrontRange has identified no business lost as a result of the email.  FrontRange claims "reputational" damages and loss of trademark value (it is unclear how this is distinguished from the reputational damages) as a result of the email blast.  However, the evidence supporting these alleged damages is essentially the pure speculation and guesswork of John Hillyard, a former vice-president of finance at FrontRange, based on numerous unfounded assumptions.  For example, in making these calculations, Hillyard assumes that Defendants accessed and obtained FrontRange's customer database, but there is simply no evidence of this.  Hillyard also assumed that every person who received the email read it and then forwarded it extensively, all of which is completely speculative.  Hillyard's deposition testimony demonstrates that he basically chose a number that he felt was appropriate for these

23

damages claims.  This does not satisfy the requirements of demonstrating actual, non-speculative damages.  *See Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1024 (Colo. App. 1993) (damages award cannot be based on speculation or conjecture; a party must submit "substantial evidence, which together with reasonable inferences to be drawn therefrom, provides a reasonable basis for computation of the damage.") (citation omitted).

In response, FrontRange argues that its trademark claims do not require a showing of damages because it is entitled to an injunction, an accounting, and attorneys fees. Without a likelihood of customer confusion or damages, FrontRange is not entitled to a permanent injunction.[8]  In addition, I agree with Defendants that FrontRange is not entitled to an accounting as the evidence is undisputed that no sales of Autobahn resulted from the email blast.  Finally, although 15 U.S.C. § 1117(a) permits a recovery of attorneys' fees in "exceptional cases," under controlling case law, an exceptional case is "one in which the trademark infringement can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'"  *VIP Foods, Inc. v. Vulcan Pet, Inc.*, 675 F.2d 1106, 1107 (10th Cir. 1982).  The undisputed evidence does not demonstrate that this is an exceptional case.  Rather, the evidence shows that the email blast was designed by Phelps based on his knowledge of FrontRange's guidelines for use of the mark by third parties and with a conscious effort to ensure that no confusion would result.  Accordingly, the trademark claims should be dismissed.

4.    Misappropriation Claims

---

[8]    I granted FrontRange a preliminary injunction by order dated October 29, 2004, but the issue of customer confusion was not litigated in those preliminary proceedings.

Defendants argue that the misappropriation claims fail because the customer list used by NewRoad in the email blast was not a trade secret and because Defendants did not acquire it using improper means. For the reasons that follow, I conclude that the customer information is not FrontRange's trade secret.

First, FrontRange offers no evidence sufficient to create a genuine issue of fact as to whether the Defendants obtained or used FrontRange's own customer database or complete customer list. FrontRange offers no evidence at all that Phelps took any customer information with him upon his departure from FrontRange or that Defendants otherwise obtained the database. The mere circumstance that some of the names on the ECS contact list overlapped with FrontRange's presumably much larger customer list is of little surprise and, standing alone, does not show that the database was taken in its entirety. NewRoad has provided undisputed evidence as to how the ECS customer/prospect list was compiled and how NewRoad and Phelps sorted that list to come up with the recipient list for the email blast. This is an important distinction because while the entirety of customer information contained in the FrontRange database might be a trade secret, I conclude that the intermittent provision of customer leads and partial lists to suppliers and other shared customer information is not a trade secret as a matter of law.

The evidence demonstrates that the ECS customer/prospect database was compiled from a number of different sources, including leads provided by FrontRange, direct collection of information from users in a variety of circumstances (including events sponsored by FrontRange but also independent events), and research using purchased target lists. While some of this information, such as leads provided by FrontRange to

ECS, may have been subject to confidentiality provisions in agreements between FrontRange and ECS, that does not make it a trade secret *per se*.

Under Colorado law, the factors to consider in determining whether a trade secret exists includes the following: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business; (3) precautions taken by the holder of the alleged trade secrecy to guard secrecy of information; (4) the savings effected and value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.   *Colo. Supply Co. v. Stewart,* 797 P.2d 1303, 1306 (Colo. App. 1990).

Again, key to this analysis is the difference between uncollected information about the identities of various HEAT users, as opposed to FrontRange's customer database, which contains detailed product purchasing history and other valuable information. Applying the first factor, it is clear that FrontRange prominently advertises the identities of many of its customers on its website as a marketing tool.  It also permits free sharing of customer information at its user group meetings and at supplier-sponsored events.  ECS was also able to obtain this information without restriction at trade shows and other sources completely unrelated to FrontRange.  There is little direct evidence as to the second factor, but FrontRange's customer service reports demonstrate that the identities of FrontRange's customers is known among employees.  The third factor weighs in favor of FrontRange, in that it does take some precautions to protect this information by requiring employees and resellers to sign confidentiality agreements.  The reseller

agreements include as confidential information "the identities of and [FrontRange's] relationship with End-Users and prospective End-Users."  However, there is some ambiguity in these agreements as they appear to contemplate that resellers will develop their own customers and prospects, which are excluded but may well overlap with FrontRange's end-user list.  The remaining factors all weigh against FrontRange.  The undisputed evidence shows that most of the effort and expense of researching and compiling the ECS customer list, and the value obtained thereby, was performed by ECS, not FrontRange.

The ECS customer database is not FrontRange's trade secret information as a matter of law.  In addition, as discussed above, FrontRange has not shown that it incurred any damages as a result of the Defendants' use of the ECS list.   Accordingly, FrontRange's misappropriation claims should be dismissed.

5.   Interference with Contractual Relations

FrontRange's final claim is that the Defendants interfered with FrontRange's contractual relationship with ECS by causing it to disclose information covered by a confidentiality agreement.  Defendants argue that because Kurzinski and George are officers of ECS, they could at most have interfered with their own contract, not with that of a third party.  In its response brief, FrontRange apparently abandons this theory and argues that NewRoad and the other defendants interfered with FrontRange's relationships with its customers by installing early versions of WC2 without FrontRange's consent. Because this theory was never pled as a cause of action, and FrontRange does not even attempt to respond to Defendants' argument on summary judgment, I consider this claim

to be abandoned.[9]

      Accordingly, it is ordered:

1.     Defendants' motion for summary judgment (doc no. 99) is granted in part.

2.     Plaintiff's First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, Eleventh and Twelth causes of action are dismissed with prejudice in their entirety.

3.     Plaintiff's Ninth cause of action (breach of the consulting services agreement) remains pending.

4.     Summary judgment shall enter as to FrontRange's liability for NewRoad's counterclaim (breach of the software purchase agreement resulting from FrontRange's cessation of royalty payments).  Damages shall be determined at trial.

      DATED at Denver, Colorado, on August 31, 2007.

BY THE COURT:


s/ Walker D. Miller
United States District Judge

---

[9]Although no party has directed the court's attention to the pretrial order, I take notice that no theory for this claim is identified in the pretrial order.  Accordingly, I conclude that FrontRange has not preserved its new theory as a basis for its tortious interference claim.